## UNITED STATES v. LONG.
### No. 13048.

District Court, D. Massachusetts.
March 10, 1936.

Francis J. W. Ford, U. S. Atty., of Boston, Mass., by Arthur J. B. Cartier, Asst. U. S. Atty., of Fall River, Mass.

John B. Hayes, of Fitchburg, Mass., for defendant.

BREWSTER, District Judge.

In this case the defendant was indicted under title 18 U.S.C.A. § 80, Cr.Code, § 35, as amended, the United States alleging in five counts that on five different occasions he caused to be used a false pay roll in a matter within the jurisdiction of an agency of the United States, to wit, the pay roll for Public Works Administration, Project No. 2384, Water Works System in the Town of Townsend. The pay rolls in question were for the weeks ending July 7 and 14, 1934, and December 29, 1934, and January 5 and 12, 1935.

Upon the trial with jury, at the conclusion of the government's evidence, I directed a verdict for the defendant. The prosecuting attorney requested that I file a written memorandum of my reasons for the directed verdict. While this request is unusual, I am willing to comply in this instance, especially since erroneous statements have been given wide currency respecting the legal effect of my ruling.

The government's evidence could be held to have established the following facts:

The defendant entered into a written contract with the town of Townsend acting through its board of water commissioners, whereby the defendant undertook to perform certain work consisting of rock excavation and macadam resurfacing. The compensation for this work was based upon unit quantities, the town paying a specific sum per cubic yard for the excavating and resurfacing. He also undertook in the same contract to furnish a concrete foundation for standpipe, for which he was to receive a lump sum in payment.

The advertisement for proposals and the proposals recited that the contract would be awarded subject to federal funds, and the requirements of the National Industrial Recovery Act (section 201 et seq. [40 U.S. C.A. § 401 et seq.]), and that all work and materials furnished should be in compliance with the requirements of that act. The defendant stipulated to pay certain minimum wages. Attached to the contract were certain provisions which were said to constitute a part of "all contracts and subcontracts for work on any non-Federal projects, both public and private, which are financed in whole or in part by the Federal Emergency Administration of Public Works * * *."

Among these provisions was one requiring the payment of certain minimum wages, and a further requirement that all employees should be paid at least weekly without deduction or rebate. I do not find among these provisions anything requiring the contractor to submit weekly payrolls. There was a provision requiring monthly reports, but these were not involved in this proceeding.

It is possible to infer from the testimony that the resident engineer in charge who represented the United States received from the contractor weekly pay rolls from which the monthly reports were made up.

The pay rolls for the weeks ending July 7 and 14, which were submitted by the defendant, showed that a foreman had been paid $97.50 a week. This foreman, according to the government's evidence, was, in fact, interested in a corporation which

was financing the work and which was to participate in the profits, if any, accruing from the contract. For the weeks ending July 7 and 14 this foreman did not draw his salary, preferring to leave the money in the treasury of the corporation. There was no evidence that, at the time the pay roll was verified by the defendant, he was aware of the action of the foreman; but if he was, there was no justification for the belief that the defendant had any intention to deceive or defraud either the town or the government. The foreman had worked the number of hours shown in the pay roll, and subsequently received compensation.

About December, 1934, the defendant and the corporation above referred to (which was the real party to the contract) became financially involved, and the defendant was unable to meet the pay rolls for the weeks ending December 29, 1934, January 5 and 12, 1935. At the end of this period, because of the weather as well as the financial condition of the defendant, the work was suspended and was not resumed until May, 1935, when the work was taken over by the surety company which completed the contract. No pay rolls for these three weeks were submitted until May, 1935, when a new resident engineer took charge of the work. This engineer, in order that he might complete his record, asked the defendant to submit the pay rolls for these weeks. This the defendant did by handing to the engineer three sheets entitled "Payroll Record" for the weeks ending December 29, 1934, January 5 and January 12, 1935, respectively. These sheets gave the names of the employees and the amounts paid to each. There is no suggestion to be found in the evidence that these employees were not employed as stated in these records. On each of these sheets the defendant signed a statement that they were true and accurate records of the hours worked by and the wages paid to each employee. He did not make oath to these records. Strictly speaking, the statements signed by defendant were inaccurate since the employees had not then been paid. The records were true so far as they reflected the hours worked and the wages earned by each employee. The evidence of the government left no room for doubt that the engineer knew, and was told by the defendant, that these wages had not been paid at that time. They were subsequently paid. Moreover, the resident engineer testified that the defendant asked him to hold these three pay-roll records until the employees had received their wages, as specified therein.

Upon this state of facts, I ruled that the evidence did not bring the case within the reasonable intendment of section 35 of the Criminal Code, as amended (title 18 U.S.C.A. § 80). This section, designed to prevent frauds upon the government, provides that:

"Whoever shall make or cause to be made or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, any claim upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent; or whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

The pay rolls in question were not presented for the purpose of obtaining any payment from, or asserting any claim against, either the town or the United States, and for that reason did not come within the purview of the statute. Moreover the jury, on the government's evidence, would not have been warranted in finding that the statements were fraudulent or made with any fraudulent intent.

While it may be argued that the statements to which the defendant subscribed were false, in the sense that they were inaccurate, they were not false in the sense that they were fraudulent or fictitious

statements. Everybody interested knew the true situation, and the three later pay rolls were never intended for anything more than information showing what the defendant owed for the three weeks involved.

Unquestionably the evidence disclosed a failure on the part of the defendant to fully perform the provisions of the contract respecting weekly payment of wages, but a breach of contract is not an offense denounced by the statute upon which this indictment was laid.

Of controlling importance is the fact that no money was advanced to the defendant by the town predicated upon these erroneous records. Defendant's compensation was measured by the unit quantities of work which he had completed. It is impossible to conceive how the town or the United States was in the slightest degree prejudiced by the acts of the defendant in submitting these records.

If I were to construe the statute as apparently the prosecuting officer would have me do, it would mean that any one dealing with the United States who made an error in his reports, however innocuous or innocent it might have been, would be liable to be indicted as a criminal and, if found guilty, subjected to serious penalties. I cannot accept or act upon any such construction. I am satisfied that the element of fraud must always be present if the government is to achieve a conviction under this section.

It must be quite apparent from the foregoing that my ruling did not involve any loss of identity of federal funds, or any loss of power to control or to punish for any act unlawfully diverting any of these funds. I merely ruled that, on the evidence, there was no showing of fraud or any presentation of a fictitious or fraudulent claim, which is the gist of the offense, as I read the statute. If the status of the federal funds had been involved, there was no evidence before the court which would enable either the court or the jury to determine just what the rights and obligations of the United States were under their arrangement with the town of Townsend.

My ruling did not in the slightest degree conflict with anything which was said by the Circuit Court of Appeals for this circuit in the case of Madden v. United States, 80 F.(2d) 672.